J. E. BROWN, Adm'r. of W. H. SNEED *vs.* W. M. SMITH.

Where an agent is authorized to sell property, he must sell for money, unless otherwise specially instructed ;

Therefore, when an agent, without instructions, sold the property of his principal for seven-thirty bonds, when such bonds were not circulating as money; *Held*, that he exceeded his authority, and his principal was not bound by the contract, unless ratified by him.

Where such bonds were received by the principal in exchange for his property, and he intended to repudiate the contract, it was his duty to return the bonds if he could do so, or give notice to the parties interested. Acquiescence, without a sufficient excuse or explanation, would amount to ratification.

When the owner of property and his agent are in different localities, it is competent, in order to negative the idea of acquiescence in a sale, to show that telegraphic communication between the two points was cut off, and that the wife of the principal, who was confined by sickness, endeavored to send a telegram repudiating the sale on the part of her husband.

This was an action of detinue, instituted in the Superior Court of MECKLENBURG, by order of the Supreme Court in the case of Stenhouse & McCauley against the plaintiffs and defendant. Plaintiff was directed to bring an action and the defendant was required to admit the service and demand, &c. The cause was tried at a Special Term of Mecklenburg Superior Court, *Moore, J.*, presiding.

The action was brought for the detention of a large number of books, some 1,200 volumes, which plaintiff alleged was the property of his intestate. Defendant claimed title under an alleged sale made by one Latta, as agent of plaintiff's intestate.

It was in evidence that W. H. Sneed, plaintiff's intestate, was the owner of a large number of books—law and miscellaneous; that he was a resident of the city of Knoxville, Tennessee, and that during the war he left his home and took up a temporary residence in the town of Salem, N. C. One Latta

testified, that in August, 1864, he received a letter from Col. Sneed, written from Salem, N. C., instructing him to take charge of his books, which had been shipped to Augusta, Ga., and placed in care of a gentleman in that place, to sell them at auction, if he could do so without too great a sacrifice. He wrote another letter, 16th of August, urging a sale, if it could be made without too great a sacrifice, and further instructing him to "do what he thought best." In October, 1864, Col. Sneed was at Hamburg, S. C., wanted to borrow money and told deponent he must sell the books, and to do with them as if "*they were his own.*" Another letter was written, advising witness to store the books in a garret, or other safe place in Augusta, Ga., and requesting a sale "if possible." Witness stated, that before any sale could be made, Augusta was threatened, and defendant shipped the books to Columbia, and fearing their safety there, shipped them again to Charlotte, N. C., and stored them with Stenhouse & McCauley, merchants in Charlotte. Witness further stated that the removal from Augusta to Columbia was in December, 1864, and to Charlotte in January, 1865. During the time the books were in Columbia, having notified Col. Sneed of the move, he wrote witness a long letter, which is lost, in which he complained of the expense of moving the books, and instructed witness to put them in the hands of some reliable commission or auction house in Columbia for sale. Witness endeavored to comply with the request, but owing to the excitement and clamor of the people, he was unable to make the arrangement.

Soon after they were removed to Charlotte, witness had an offer for them, and after consultation with two friends he concluded to take the offer, which was made by the defendant, and was $25,000, in "seven thirty bonds of the Confederate States," with $1,800 of interest due. Witness accepted the offer. There were 1200 volumes, as was supposed, but in case they fell short of that number, a *pro rata* deduction was to be made. An order was given to the defendant on Stenhouse &

McCauley. Afterwards, it was agreed that the books should be taken at 1200 volumes, without a count, and about the 18th of February witness gave to Dr. Ramsey, to express to Sneed, the sum of $22,000 in Confederate bonds. Witness, upon cross-examination, stated that he could not state the precise limit stated in Col. Sneed's letter, but thinks it averaged about $16 per volume. He did receive a communication from Col. Sneed, asking him not to close at the price offered ; does not remember that he wrote any letter after the 17th of January, 1865 ; thinks seven-thirty bonds worth about sixty-three per cent in Confederate money, when the trade was made, in February 1865.

It was in evidence that the books were sold just before the fire in Charlotte, which was in February, 1865 ; that seven-thirty bonds did not pass as currency for some months before the surrender. They were held as bonds, and as stock changed hands, probably ceased to circulate as currency six months before the war closed.

It was in evidence, that Sneed in the Winter of 1863–'64 asked $30,000 for the books. That all mail communications between Augusta and Virginia were broken up as early as February, 1865. From depositions and testimony offered by defendant, it appeared that in the Spring of 1865, defendant gave to one of the witnesses an order on Stenhouse and Mc-Cauley for a library of books, contained in boxes. Witness did not remove the books, but left them in the store house, and went to Virginia. He returned to Charlotte and remained some time, and he considered the books delivered to him. After the surrender, witness wrote to Stenhouse & McCauley to hold the books subject to the order of defendant. Dr. Ramsey stated that he was requested to count the books, but did not do so ; that at the time Latta asked him to express to Col. Sneed, who was then at Liberty in Virginia, a package of money, he went to Greensboro and expressed a package to Col. Sneed containing about $22,000 in seven-thirty bonds. A

witness testified that he became acquainted with Col. Sneed at Liberty Virginia, where he resided in December, 1864, and in January, 1865, his health began to fail and continued to do so until witness left in May.  He returned in June and found him prostrated, and for six weeks he was not himself.  Witness stated that the mail stopped conveying letters to Liberty the latter part of March, 1865, and it must have stopped before that time to Charlotte.  Telegraphic communication was not in use, for several months, from Liberty Virginia.  There was other testimony, that communication by mail between Charlotte and Lynchburg Virginia was stopped in the Spring of 1865, and were not re-established until September of that year. The deposition of a witness was offered by plaintiff, for the purposes of proving that Mrs. Sneed sent him a dispatch to be telegraphed to Latta, at Charlotte N. C., in the early part of the year 1865, repudiating the contract for sale of the books. Objection was made by defendant, and the testimony was rejected by the Court.  Another deposition was offered and rejected by the Court for want of sufficient notice.  The notice was twenty-four days.  The deposition was to be taken in Knoxville Tennessee, a distance of 231½ miles.

The Court explained to the jury the difference between a general and a special agency, and the difference between authority and instructions; that the burden of proof was on the defendant to establish the agency, and that done, it rested on the plaintiff to show a revocation ; that if the agency was special, with limited powers, the agent must keep within his limits ; but that the directions to sell *en masse* if he could, and if he could not, to open the boxes and sell in small quantities, was not a limitation of the agency ; that the directions to store the books in some isolated place in Augusta was not a revocation of the agency, nor was it a revocation when Latta was directed to store the books with some responsible commission merchant in Columbia, to sell ; that if Sneed repudiated the sale as soon as he heard of it, that made no difference if Latta

was his agent and the repudiation came after the sale was complete ; that if Sneed received the bonds and did not offer to return them, that it was a ratification of the sales ; that if Latta sold the books for $25,000 of Confederate bonds, worth only $300 in gold, it made no difference, if the defendant bought in good faith, and the jury is not called upon to make a bargain for the parties. These facts are only to be considered as evidence of collusion, or bad faith of the purchaser.

There was a verdict for the defendant; Motion for a new trial ; Motion overruled ; Judgment according to verdict; Appeal to the Supreme Court.

*Wilson* and *Guion*, for the plaintiff.
*Vance* and *Dowd*, for the defendant.

READE, J. We see no error in the instructions as to what was necessary to constitute Latta the agent of Sneed to sell the books, nor as to the revocation of his agency. From the verdict of the jury, therefore, we are to understand that Latta was authorized to sell the books ; but still it does not follow that he was authorized to make *such* a sale as he did make. We must, therefore, consider this question.

When an agent is authorized to sell property he must sell for money, unless special instructions take it out of the general rule. He cannot barter or exchange one commodity for another. And if he does so it does not bind the principal ,unless he ratifies it. This position is sustained by the authorities cited by plaintiff's counsel. There is nothing, in so much of the evidence as is stated, to take this case out of the general rule. It is true that Sneed frequently urged a sale and expressed anxiety as the safety of the books :—at one time saying to Latta, " do with them as you think best ;" at another, " do with them as if they were your own ;" and at another, " I leave them to your discretion." But these expressions seem to have been with reference to the *price* at which he might sell them, and to

the *place* where he might keep them. And there is nothing to authorize the inference that he might dispose of them for anything but money ; on the contrary, he was urging his want of money as a reason for the sale. We must take it, therefore, that Latta had power to sell the books at such price as he pleased, but he had no right to sell them for Confederate bonds, unless they were circulating as money. And of this the defendant was obliged to take notice. The validity of the sale, and how far Sneed was bound by it, depends, therefore, upon the question, whether Sneed ratified it. That was a question for the jury, under proper instructions as to what would amount to such ratification. In regard to that, his Honor charged, that " if Sneed received the 7.30 bonds and did not offer to return them, it was a ratification." This, although true in the general, might have misled the jury. If, as was alleged, the telegraph line was down, and the mail stopped, and other ways of communication cut off, it might have been out of his power to return them, or, in terms, to repudiate the contract. These considerations ought to have been left to the jury. It certainly was the duty of Sneed to return the bonds, if he could, if he did not mean to ratify the contract: and a failure to return them, without a sufficient excuse, would have been a ratification. And, in this connection, we think the fact that Sneed's wife went to the telegraph office to send a telegram to Latta, that the contract was repudiated, was competent evidence. It was competent to show, that telegraph communication was cut off; and if she was Sneed's agent, then it was competent to show, also, that he did not ratify the contract. But still, in this connection, it ought to have been considered whether, if there had been notice given to Latta, that would have been sufficient—whether notice ought not to been given to the defendant as well : for, although an agency may be revoked at the pleasure of the principal, and simply by notice to the agent, yet that is subject to the exception, that if the agent has begun to execute his power and his incurred risk or expense;

he must be saved harmless; and if the interest of a third person has become involved, such interest cannot be disregarded. It ought, therefore, to have been a subject of inquiry, whether Sneed had been informed that the books had been sold to the defendant and had been informed of the terms of sale, and, especially, that they were sold for Confederate bonds. If he was not so informed, then his want of information was of itself a sufficient excuse why he did not immediately communicate with the defendant, as well as with Latta. If he was informed of it, then he was thereby put in relation with the defendant, and his conduct ought to be construed with reference to the defendant as well as Latta.

His Honor also charged the jury, " that Sneed had no right to repudiate the contract of his agent, Latta, after it was completed." That would be true if Latta had made such a contract as he was authorized to make, *i. e.*, sold for money, or something that was passing as money currency. But here, upon the supposition that 7.30 Confederate bonds were not current as money, he had made a contract which was not binding upon Sneed until and unless Sneed ratified it. So that, it was incumbent upon the defendant to show that Sneed ratified it, and not upon the plaintiff to show, that Sneed repudiated it. But still this must be understood with the qualification, that it was the duty of Sneed to repudiate it; and that aquiescence, without excuse or explanation, would amount to ratification.

There is error.

PER CURIAM.                              *Venire de novo.*